IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Arif Majid,                                                        Case No. 1:13CV843

               Petitioner

        v.                                          **ORDER**

D. Morgan, Warden,

               Respondent

     This is a state prisoner's habeas case under 28 U.S.C. § 2254.

     After a 2011 trial in the Common Pleas Court of Cuyahoga County, Ohio, a jury convicted

the petitioner, Arif Majid, of murder, attempted murder, and having a weapon while under a

disability. *State v. Majid*, 2012-Ohio-1192 (Ohio App.).

     The evidence showed that Majid fired six gunshots into a crowded bar after fighting with the

management, killing one patron and wounding two others:

> [O]n the night of September 3, 2005 and the early morning hours of September 4,
> 2005, [Majid] went to Milton's Lounge in Euclid, Ohio. The bar had a crowd of
> approximately fifty people at the time, slightly under maximum capacity. [Majid],
> described as a light skinned African American male, was accompanied by his brother,
> Lecarlton Parker, who was described as a dark skinned African American male and
> two of Lecarlton's friends, Christopher Core and Clifton Harris. Witnesses inside the
> bar described [Majid] and his group as "rowdy." While on the bar's dance floor,
> [Majid] twice removed his shirt and was asked by bar employees to re-dress. A
> number of witnesses reported taking notice of distinctive tattoos on [Majid]'s bare
> torso, including a prominent "jihad" tattoo across his back and shoulders. [Majid]'s
> group was eventually asked to leave by bar management after an unknown member
> of the group dropped a drink on the dance floor. While witness accounts at trial were
> conflicting as to whether [Majid]'s group left the bar on their own accord, which bar
> employees escorted the group out, whether the group left with or without making a

disturbance and whether threats were made as the group was leaving, all witnesses agreed that the group did exit the bar.

[Majid] and Lecarlton remained on the sidewalk outside the bar, visible through the bar's front picture window. Milton Franklin, Jr., the bar's owner, asked the men not to loiter outside the bar but his request was ignored. Milton Franklin III, the son of Milton Franklin, Jr., and an employee of the bar, joined the confrontation just outside the bar's door and angry words were exchanged between Milton Franklin III and the men. Christopher Core testified that he and Clinton Harris had walked back to their car while [Majid] and Lecarlton remained. Core testified that he heard Lecarlton exchange angry words with another man. Milton Jr. brought Milton III back inside the bar and began to close and lock the front door when someone outside of the bar punched the small square window in the bar's door, causing it to crack. A witness in the parking lot indicated that a darker skinned man punched the door's window and D.N.A. evidence was introduced that Lecarlton had left traces of blood on the small window.

Milton III responded by pulling a gun and, from the bar's doorway, firing what he described as warning shots in the direction of [Majid] and Lecarlton. Christopher Core testified that after he heard gunshots he heard [Majid] shout, "somebody tried to shoot my brother" and [Majid] and Lecarlton retreated into the parking lot while Milton III went into the bar and Milton Jr. locked the door.

[Majid] and his brother were seen running back to the bar and shortly thereafter the small window in the bar door was fully knocked out and a light skinned arm was extended through the window holding a gun and at least two shots were then fired into the bar. The bar's bouncer, Wesley Williams, struggled with the gun arm until it was retracted through the door. Paulette Shelton testified that she was able to see through the window of the door and she identified [Majid] as the shooter to whom the gun arm belonged.

Witnesses testified that after the arm holding a gun was extracted from the window they saw [Majid], outside the bar's front picture window point his gun at the bar and begin firing. Witnesses recognized [Majid]'s face due to the attention he drew to himself earlier on the dance floor. Milton III testified that at the time of the shooting through the picture window, he was standing in front of the window inside of the bar when [Majid] saw him through the window and began shooting in his direction.

Three bar patrons were struck by bullets as a result of the shooting. Jerome Thomas was shot twice and died as a result of his wounds. Rayshawn Whitsett was shot in the hip and Marcus Barnes was shot in both legs.

*Id.* at ¶¶7–12.

2

The Ohio Court of Appeals affirmed Majid's convictions, but remanded for resentencing. On remand, the trial court imposed an aggregate sentence of forty-three years' to life imprisonment. The Ohio Supreme Court declined Majid's ensuing application for discretionary review. *State v. Majid*, 132 Ohio St. 3d 1464 (2012) (Table).

Majid then filed a habeas petition in this court, raising twelve grounds for relief. (Doc. 1).

Pending is Magistrate Judge Knepp's Report and Recommendation (R&R), which recommends that I deny relief. (Doc. 22). Majid has filed a one-hundred-and-thirty-three-page objection. (Docs. 35, 35–1, 35–2, 35–3).

For the following reasons, I overrule the objections, adopt Magistrate Judge Knepp's R&R as the order of the court, and deny the petition. I also issue a certificate of appealability on Majid's prosecutorial-misconduct claim.

## Discussion

Because the R&R contains a comprehensive discussion of the evidence, Majid's claims, and the relevant law, I presume the reader's familiarity with it and proceed directly to Majid's objections.

### A. Claims 1 and 11: Sufficiency of the Evidence

Majid's first claim is that the evidence was insufficient to convict him of murder.

He contends no reasonable jury could have found him guilty because: 1) the blood found on the bar's broken window did not match his blood type; 2) the eyewitnesses' descriptions of the shooter did not match his appearance; 3) one witness heard gunshots at the same time he saw Majid sitting in a car, not firing a gun; and 4) there was no evidence of intent to kill. (Doc. 1 at 7).

3

In his eleventh claim, Majid contends the evidence does not support his conviction for the attempted murder of Marcus Barnes. Because Barnes did not testify, Majid argues the jury had no basis on which to convict him of attempted murder. (Doc. 1 at 27–28).

Magistrate Judge Knepp concluded Majid procedurally defaulted his first claim in part, as he did not present the first three factual bases of the claim to the Ohio Supreme Court. (Doc. 22 at 14–15). The Magistrate Judge then found that, to the extent Majid preserved the claim, the state appellate court reasonably concluded that ample evidence supported the convictions. (*Id.* at 30–35).

Majid objects to the default ruling on two grounds. He contends that: 1) he raised this claim as a federal claim during his direct appeal; and 2) his appellate brief presented all factual bases of the claim to the state courts. (Doc. 35 at 18–22).

On the merits, Majid argues that "[t]he jury could only extract a reasonable speculation as oppose[d] to sufficient evidence that [he] is guilty of the crime." (Doc. 35–2 at 14–17).

These objections lack merit.

First, there is no question that Majid's sufficiency-of-the-evidence claim raised a federal question, and the Magistrate Judge never suggested otherwise. Majid's objection is beside the point.

Second, there is likewise no question that Majid did not fairly present the first three factual bases of his sufficiency claim to the Ohio Supreme Court. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (purpose of fair-presentment requirement is to "provide the state courts with a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim") (internal quotation marks omitted).

4

In attempting to show otherwise, Majid relies, not on his Ohio Supreme Court pleadings, but on the *pro se* brief he filed in the Court of Appeals. (Doc. 35 at 22). My review of the former pleading confirms what the Magistrate Judge found, and I therefore adopt his default ruling.

Third, I agree with the Magistrate Judge that it was reasonable for the Ohio Court of Appeals to conclude there was sufficient evidence for a conviction on the murder and attempted-murder charges.

As the Court of Appeals found, "[f]our separate witnesses . . . testified to seeing [Majid] fire the gunshots that came into the bar through the picture window." *Majid*, *supra*, 2012-Ohio-1192, at ¶21. Another witness testified she saw Majid "fire the shots that came through the window in the bar's door." *Id.* All had seen Majid before the shooting, when his rowdy behavior on the dance floor, and his unique tattoos, drew the crowd's attention to him.

Moreover, the prosecution introduced evidence that Majid "fired specifically at Milton Franklin III[.]" *Id.* at ¶25. It was Franklin III who had fired several "warning shots" in Majid and his brother Lecarlton's direction after Lecarlton broke one of the bar's windows. This testimony supplies some evidence of Majid's motive and intent.

That Majid's bullet happened to strike and kill Jerome Thomas, rather than Franklin III, does not undermine the conviction, given Ohio's transferred-intent doctrine. *See id.* ("an offender who intentionally acts to harm someone but ends up accidentally harming another is criminally liable as if the offender had intended to harm the actual victim").

Finally, the Court of Appeals concluded that, notwithstanding the absence of Barnes's testimony, the testimony of eyewitness Rayshawn Whitsett, the testimony of the lead detective, and

medical records sufficed to show "Barnes received gunshot wounds to both his legs as a result of this shooting." *Id.* at ¶27.

This evidence, taken in the light most favorable to the prosecution, established Majid's guilt of murder and attempted murder beyond a reasonable doubt. Because the state court acted reasonably in affirming the convictions, I overrule Majid's objection.

### B. Claim 2: Suggestive Identification

Majid's second claim is that the out-of-court identification procedure by which several witnesses identified him as the shooter was unduly suggestive. (Doc. 1 at 9).

Magistrate Judge Knepp concluded that this claim is defaulted because the state appellate court rejected it on an independent and adequate state-law ground: Majid did not include in the record on appeal a transcript of the hearing on his motion to suppress the identification. (Doc. 22 at 17).

The state appellate court ruled that it was Majid's burden "when urging on appeal that evidence was improperly admitted . . . to include in the record a transcript of all evidence relevant to the findings or conclusions and to illustrate any error by reference to them in the record." *Majid*, *supra*, 2012-Ohio-1192, at ¶35 (quoting Ohio App. R. 9). Given the missing record, the appellate court held that it had "no choice but to presume the validity of the lower court's proceedings, and affirm." *Id.* at ¶36.

Majid's objection does not provide a plausible basis for rejecting Magistrate Judge Knepp's ruling, nor does he suggest there are grounds on which to excuse his default. (Doc. 35 at 23–24).

I therefore hold that the state court's reliance on Appellate Rule 9 was an independent and adequate ground of decision that blocks habeas review of the suggestive-identification claim. *Braun*

*v. Morgan*, 2014 WL 814918, *33 (N.D. Ohio) (Nugent, J.) (non-compliance with Ohio App. R. 9 constitutes procedural default).

### C. Claim 3: Prosecutorial Misconduct

In his third ground for relief, Majid alleges the prosecutor engaged in pervasive misconduct. (Doc. 1 at 10–11). He contends the prosecutor:

- misused a photo array while questioning witness Robert Sanders;

- withheld a "[m]issing photo array" and was otherwise responsible for "[s]uppression and missing of [*sic*] evidence" (*id.* at 11);

- insinuated that the defense's expert on eyewitness identifications, Dr. Solomon Fulero, had "engaged in some alleged coercion with defense counsel" and "was a drug dealer" himself (*id.*);

- asked witness Rayshawn Whitsett about his understanding of the concept of "jihad" and witness Milton Franklin III to define "[I]slamic terms" and discuss his father's religion (*id.*);

- argued to the jury that the tattoos on Majid's back, including the terms "Mujahid" and "Jihad" and a depiction of a sword, were evidence of guilt and dangerousness (*id.*); and

- characterized Majid as an "Islamic warrior," a "coward," and "an embarrassment to the religion he professes to serve." (*Id.*).

The Magistrate Judge rejected this claim as defaulted in part and meritless in part. (Doc. 22 at 18–20).

Magistrate Judge Knepp first concluded that the state appellate court rejected Majid's claim *vis-a-vis* the questioning of Sanders on the independent and adequate state-law ground that Majid did not make a contemporaneous objection. (*Id.* at 18–19). The Magistrate Judge then determined Majid did not fairly present his claim concerning the allegedly suppressed or missing evidence to either the state appellate court or the state supreme court. (*Id.* at 19–20).

7

Finally, the Magistrate Judge ruled that the Ohio Court of Appeals reasonably rejected Majid's claims regarding the questioning of Dr. Fulero, the prosecutor's examination of Franklin III, and the prosecutor's references to Majid's tattoos in summation. (*Id.* at 35–40).

### 1. Use of Photo Array while Questioning Sanders

Majid first objects that, contrary to statements in the Court of Appeals's opinion and the R&R, he did, in fact, object to the prosecutor's use of a disputed photo array while questioning Sanders. (Doc. 35 at 27–30). According to Majid, his trial lawyer made a "continuing objection" to all "identification" testimony, including Sanders's testimony. (*Id.* at 27–28).

Like the Magistrate Judge, I find that the parts of the record on which Majid relies (*see* Doc. 8–7 at 160–61) do not substantiate his continuing-objection argument.[1] Accordingly, the state appellate court's invocation of the contemporaneous-objection rule to reject this claim worked a procedural default. *Scott v. Mitchell*, 209 F.3d 854, 873 (6th Cir. 2000).

In any event, the state court's rejection of the claim on the alternative ground that Majid did not show plain error was reasonable. *Cf. Fleming v. Metrish*, 556 F.3d 520, 530–32 (6th Cir. 2009) (Ohio Supreme Court's review of defaulted *Miranda* claim for plain error was a merits adjudication for purposes of § 2254(d)); *accord Frazier v. Jenkins*, 770 F.3d 485, 506 (6th Cir. 2014) (Sutton, J., concurring in judgment).

According to the state appellate court:

Appellant argues that the prosecutor took from appellant's counsel a photocopy of a photo array containing a picture of appellant and his tattoos, marked it State's

---

[1] Indeed, the record shows that defense counsel's continuing objection had nothing to do with Majid's current prosecutorial-misconduct claim. Rather, counsel objected that: 1) the prosecutor should not publish any exhibit to the jury before the court had ruled on its admissibility; and 2) the identification process violated Ohio law. (Doc. 35 at 28).

Exhibit 241, and improperly used the exhibit during Robert Sanders's testimony. Furthermore, Sanders confusingly testified that pencil markings on the exhibit were his own. Appellant's counsel did not object to the prosecutor's use of this document.

\* \* \*

Even accepting as true appellant's contention that the prosecutor's actions in using the appellant's exhibit were improper, neither his rights were affected nor was he prejudiced because State's Exhibit 241 was a photocopy of the photo array originally shown to Sanders by the police and appellant's attorney cross-examined Sanders on the matter. Although Sanders initially testified that the pencil markings were his own, he eventually agreed that they may not be his markings. He was nonetheless positive that he chose the appellant in the original photo array.

*Majid*, *supra*, 2012-Ohio-1192, at ¶¶44, 46.

The state court found, in other words, that defense counsel had a full opportunity to question Sanders about the "improper" photo array. This was not, moreover, a close case: several eyewitnesses identified Majid as the shooter after getting a good look at him shortly before the shooting. In short, the prosecutor's conduct neither compromised the integrity of the trial nor prejudiced Majid. The state court's no-plain-error determination was accordingly reasonable and precludes habeas relief. *E.g. Bobby v. Dixon*, — U.S. —, 132 S. Ct. 26, 27 (2011) (habeas relief unavailable unless state court "erred so transparently that no fairminded jurist could agree with that court's decision").

### 2. Suppressed or Missing Evidence

I also agree with the Magistrate Judge that Majid's appellate-court brief "raised only the allegations that the initialed photo arrays were missing from the evidence produced [before trial] and that two different police reports existed." (Doc. 22 at 19–20). In the Ohio Supreme Court, however, Majid abandoned his claim about the missing police report and argued only that the initialed photo

arrays (i.e., photo arrays on which certain witnesses had written their initials) were "missing." (Doc. 8–2 at 223–24).

Accordingly, I concur in the R&R's recommendation that Majid defaulted all claims respecting suppressed or missing evidence, save for his challenge to the initialed photo arrays.

That claim, however, has no merit, as Magistrate Judge Knepp correctly found:

> Last is Petitioner's allegation that initialed photo arrays were missing from the evidence produced to the Petitioner before trial as a result of prosecutorial misconduct; a failure which ultimately led to a violation of his due process rights. (Doc. 19, at 46–48). In support of this argument, Petitioner cites to the trial transcript, however upon reviewing the transcript citations the Court can find no mention of missing initialed photo arrays at the citations marked. Nor is there any evidence that these alleged missing photo arrays were purposefully excluded by the direction or with the knowledge of the prosecutor or the police, in fact the Detective in charge of the investigation stated he turned over all related documents. (Doc. 1–4, at 106–07).

(Doc. 22 at 40–41).

Majid's objection provides no basis for overturning the Magistrate Judge's recommendation. Indeed, his objection to the R&R likewise fails to cite any part of the record that establishes the prosecution suppressed evidence. (Doc. 35–1 at 4–6).

I therefore overrule Majid's objection and adopt the Magistrate Judge's recommendation.

### 3. Cross-Examination of Dr. Fulero

The state appellate court rejected Majid's claim that the prosecutor had "insinuat[ed] that . . . Dr. Fulero[ ] was coerced during cross-examination":

> Appellant next argues that the cross-examination of his expert witness, Dr. Soloman [*sic*] Fulero, was improper. In the cross-examination of Dr. Fulero, the prosecutor challenged Dr. Fulero's bias and character traits.
>
> Under Evid. R. 611(B), "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular

10

facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre*, 6 Ohio St. 3d 140, 145, 451 N.E.2d 802 (1983). However, "[i]t is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence." *State v. Smidi*, 88 Ohio App.3d 177, 183, 623 N.E.2d 655 (6th Dist. 1993).

The prosecutor asked Dr. Fulero if his step-son was currently serving a prison sentence for committing a homicide and if he ever shipped marijuana in the 1970's in order to determine whether he had a potential bias against the state. The scope of cross-examination of an expert on "questions of the expert's bias and pecuniary interest and the admissibility of evidence relating thereto are matters that rest in the sound discretion of the trial court." *Calderon v. Sharkey*, 70 Ohio St. 2d 218, 436 N.E.2d 1008, at syllabus (1982). Evid. R. 616(A) includes certain acceptable methods of impeaching witnesses: "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

Because the prosecutor's cross-examination questions were made in order to determine Dr. Fulero's potential biases, the issue remains within the discretion of the trial court. We find no abuse of discretion based upon the record.

*Majid*, *supra*, 2012-Ohio-1192, at ¶¶47–50.

In concluding that this decision was a reasonable application of *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Darden v. Wainwright*, 477 U.S. 168 (1986), Magistrate Judge Knepp emphasized two points.

First, he noted that Majid had no evidence suggesting that the predicates of the prosecutor's questions were untrue. (Doc. 22 at 38). Second, he noted that the focus of the prosecutor's questioning was a permissible one: to probe the doctor's supposed bias against the prosecution. (*Id.*).

Majid's objection simply repeats his argument to the Magistrate Judge that this questioning was improper. (Doc. 35–3 at 12–14).

He offers no proof – and, more importantly, points to no evidence in the record before the state appellate court, *cf. Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) – that the prosecutor

11

knew or should have known that the predicates of his questions were untrue. Indeed, Dr. Fulero admitted that his son was in prison for homicide, but he denied having shipped marijuana in the 1970s.

Although Fulero demurred to the latter question, Ohio law permitted the prosecutor to inquire into that area provided he had a good-faith basis for doing so. *E.g.*, *State v. Gillard*, 40 Ohio St. 3d 226, 231 (1988). Once again, however, Majid has not shown the prosecutor lacked a good-faith basis to ask the question.

It was therefore reasonable for the state court to reject the prosecutorial-misconduct claim, and proper for the Magistrate Judge to recommend that § 2254(d) barred Majid from relitigating the claim in this court.

### 4. Examination of Whitsett

Majid's next contention is that the prosecutor improperly questioned Rayshawn Whitsett about his religion.

In his answer, the Warden recognized that Majid alleged that the prosecutor engaged in misconduct by questioning "Rayshawn Whitsett about his emotional view of the word jihad." (Doc. 8 at 15). Yet the Warden's brief ignored that claim and presented the Magistrate Judge with no basis for rejecting it. (*Id.* at 29–31) (procedural-default arguments in opposition to prosecutorial-misconduct claim); (*id.* at 53–59) (merits arguments in response to prosecutorial-misconduct claim).

The Warden's error, of course, does not permit me simply to issue the writ. Instead I must review the record to determine whether, as a result of the prosecutor's actions, Majid is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

12

First, a review of Majid's state-court briefs shows that he presented this claim to the Ohio Court of Appeals (Doc. 8–2 at 86–87), but not to the Ohio Supreme Court (*id.* at 223–25). The claim is therefore subject to a clear procedural default that, had the Warden invoked it, would bar me from addressing the claim. But the Warden, having failed to raise that default in his answer, has forfeited the defense. *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004).

Federal courts "have discretion, in exceptional cases, to consider a nonexhaustion argument inadverten[tly] overlooked by the State in the District Court." *Wood v. Milyard*, — U.S. —, 132 S. Ct. 1826, 1830 (2012). Unfortunately, this type of attorney error is hardly exceptional; it is, in fact, all too common.[2] I therefore decline to overlook the Warden's forfeiture.

Second, even though Majid presented his claim about Whitsett to the Court of Appeals, that court did not address it on the merits. *See Majid*, *supra*, 2012-Ohio-1192, at ¶¶38–56. Accordingly, my review is de novo. *Carter v. Mitchell*, 693 F.3d 555, 562 (6th Cir. 2012).

Whitsett, one of the attempted-murder victims, testified that he had spent two years in the United States Air Force. At the time of the shooting and the trial, he was on Reserve status. (Doc. 8–6 at 19). On the night of the shooting, he saw a group of patrons at Milton's Lounge causing a disturbance. As a bouncer escorted the group from the bar, Franklin III noticed that one member of the group was not wearing a shirt:

Q:     Was everyone wearing a shirt or something covering their upper body?

A:     Came to a point where one gentleman wasn't wearing a shirt any more.

---

[2] *E.g.*, *Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, --- F. Supp. 3d ----, 2015 WL 3505793 (S.D. Ohio 2015) (Carr, J., sitting by designation) (failure to raise affirmative defense in counterclaim); *Coupled Prods., LLC v. Modern Mach. Tool Co.*, 2014 WL 293659, *6 (N.D. Ohio) (Carr, J.) (failure to raise affirmative defense in answer); *Brooks v. Rudolph-Libbe, Inc.*, 2014 WL 1515546, *2 (N.D. Ohio) (Carr, J.) (same).

Q:      During what period of the events are you covering?

A:      On his way out he didn't have a shirt on.

Q:      Okay. And was this the only individual without a shirt?

A:      Yes. I can – yes.

Q:      Do you recall anything unusual about that person's upper body?

A:      Yes.

Q:      What do you recall?

A:      He had, he was a built guy. He had some tattoos.

                              *    *    *

Q:      And you said tattoos?

A:      Yes.

Q:      What do you recall about the tattoos?

A:      He had some on his, between his shoulder, elbow, a couple there.

                              *    *    *

Q:      Any other tattoos besides on the upper arm?

A:      It was on his back.

Q:      Did you get a view of what was on his back?

A:      Yes.

Q:      What do you remember about what was on his back?

A:      Across the top part it said Jihad, and above was a cross.

Q:      Being in the military, did Jihad have significance to you?

[Defense counsel]:      Objection.

14

| | |
|---|---|
| The Court: | Approach the bench, bring the record. |
| | State your objection, please. |
| [Defense counsel]: | The question of whether a man in the United States military that the word Jihad has any significance has no relevance with respect to the matter before this Court. It's simply to inflame the jury with respect to the fact that it means holy war and that has nothing to do with any religious beliefs here. And this witness is not competent on whether or not what that significance of a tattoo means on a person's back. |
| The Court: | Mr. [prosecutor]? |
| [The prosecutor]: | I believe it's relevant. |
| The Court: | Well, I believe the only thing relevant is whether or not he remembers that tattoo and why he remembers that tattoo not any editorializing on your behalf. But it would be relevant as to the test of memory as to why a person remembers any fact, be it a tattoo or any other fact. |
| | But you should not lead the witness, nor editorialize on what you think is the basis of his memory on any point. |
| [The Prosecutor]: | Thank you, Your Honor. |
| Q: | You saw Jihad where on the person's body? |
| A: | Yea. |
| Q: | Where was it? |
| A: | Top part – top part of the back. |

(*Id.* at 36–39).

Majid contends the prosecutor's question was improper, as the prosecutor intended it to stoke the jury's prejudice against him.

15

As Magistrate Judge Knepp recognized, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Majid must do more than show that the prosecutor's conduct was "undesirable or even universally condemned." *Darden*, *supra*, 477 U.S. at 181. He must instead show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

Majid has not carried that burden.

As the trial court suggested, the prosecutor was likely "editorializing" – injecting, in other words, his own opinion into the case – when he asked whether the word "Jihad" held any special significance for Whitsett, a member of the Armed Forces. Indeed, Whitsett never testified that it was the supposed "significance" of the word "Jihad" to him, as a serviceman, that helped him remember seeing the tattoo.

The question also directed the jury to focus, not on whether the nature of Majid's tattoo made it more likely that Whitsett was testifying accurately, but on what "Jihad" signified to Whitsett in his capacity as an American service member. Had Whitsett answered the question, his response would have been entirely irrelevant[3] and quite likely prejudicial.

The question was, in short, problematic.

But even if the question were improper, Majid has not proved that the question amounts to "flagrant" misconduct. *U.S. v. Al-Din*, 631 F. App'x 313, 334 (6th Cir. 2015).

---

[3] This is especially so, given the prosecutor's later acknowledgment that there was "no sort of religious undertone" to the dispute between Majid and the management of Milton's Lounge. (Doc. 8–9 at 150).

Most importantly, the trial court effectively sustained defense counsel's objection. That is, the court heard the lawyers at sidebar and suggested that the prosecutor move on, and not "editorialize." When the prosecutor resumed his examination of Whitsett, Whitsett did not answer the prior question, and the prosecutor did not repeat it.

Furthermore, this was the only question during the prosecutor's examination of Whitsett that Majid challenges as misconduct. At the same time, the question was obviously a deliberate one, and it was of a piece with the prosecutor's examination of Milton Franklin III, *infra*, at pp. 17–25, and his comments during closing argument, *infra*, at pp. 25–28.

Finally, the evidence against Majid was compelling and corroborated.

For all these reasons, I conclude Majid has not proved that the prosecutor's questioning of Rayshawn Whitsett amounted to "flagrant" misconduct. I therefore deny this claim for habeas relief.

### 5. Examination of Franklin III

Majid's next claim is that the prosecutor improperly questioned witness Milton Franklin III about certain Islamic terms, his beard and the Kufi he wore at Majid's trial, and his father's religious affiliation. According to Majid, these questions were part of a larger scheme "to associate [him] with Muslim 'Islamic Warriors' of the current political nature of wars in Iraq, Syria, Afghanistan, and other terrorists[.]" (Doc. 35–3 at 8).

### a. Background

My review of the state-court record shows that the complained-of questions fell into two categories.

When the prosecutor began questioning Franklin III, he asked him to explain why he was wearing "prison orange" – i.e., a prisoner's orange jumpsuit. (Doc. 8–9 at 130). Franklin III

responded by describing his lengthy criminal record and the charges for which he was then serving a substantial prison term. (*Id.* at 130–33).

The prosecutor then veered, for reasons that are not apparent, into questions about Franklin III's adherence to Islam. He elicited the fact that Franklin was a Sunni Muslim. (*Id.* at 132). He inquired into whether Franklin III's Kufi had "religious significance" for him. (*Id.*) He asked whether Franklin III's faith motivated him to wear a beard. (*Id.*). And he established that Franklin III's father was a Christian. (*Id.* at 132–33).

The second category of Islam-related questions came when the prosecutor asked Franklin III to describe his own tattoos. (*Id.* at 141). Franklin III testified that he did not have "any words [tattooed on him] that would reference your religion." (*Id.*). The prosecutor then had this exchange with him:

Q:      Do you have anything on your body like, Military Mind?

A:      No.

Q:      There is an Arabic greeting, and I don't know, maybe you can place it in context for me because I don't pretend to be knowledgeable about it, I just know of it. It begins with, I believe, Salam and another word?

A:      Assalamu Alaikum.

Q:      Can you slow that down and sound it out please?

A:      Assalam U Alaikam.

Q:      What does that mean?

A:      Peace be onto you.

Q:      Can you spell that for us, please?

A.      A-S-S-L-A-A-M, U, A-L-A-I-K-U-M.

18

Q:      And for practitioners of Islam, how is it used?

A:      As a greeting to other Muslims.

Q:      Peace be unto you?

A.      Yes.

Q:      Are you familiar with the term Mujahid?

A:      Yes.

Q:      What does it mean to you?

[Defense counsel]:      Objection.

The Court:              Overruled. He may answer.

A:      One who is struggling with things in the world. It could be your addiction to, you know, things that you know are outside of Islam. And it can also be interpreted as a soldier, but that's really an incorrect definition.

Q:      Are you familiar with the term Jihad, J-I-H-A-D?

A:      Yes.

[Defense counsel]:      Objection.

The Court:              Overruled.

Q:      What does it mean to you?

A:      Jihad is actually like the root word of Mujahid which means struggle to which you are trying to overcome. It could be strife in your nation, it could be, like I said, your addiction of doing things that you know are contrary to your beliefs of Islam. But it's also a lot of times misconstrued to mean war.

[Defense counsel]:      Objection.

The Court:              Sustained.

(*Id.* at 141–43).

19

Franklin III went on to testify that a man inside Milton's Lounge, whom he later identified as Majid, took off his shirt off and had "Islamic terms, Arabic terms" tattooed on his body. (*Id.* at 150). He did not testify as to what specific "Islamic terms" he saw on Majid's back, though he did say, in two pretrial statements he gave to police, that he saw a "Jihad tattoo" and "two swords on [Majid's] back." (*Id.* at 185, 189).

After taking the jury on this detour into Franklin III's understanding of his own religion, the prosecutor wrapped-up this part of the examination by emphasizing that the case had nothing to do with religion:

> Q:    Is there anything about that, given what we have already discussed, your religious orientation, does that have any role here in what we're going to cover?
>
> A:    No.
>
> Q:    So, although you're seeing these religiously themed tattoos, we can agree there is no sort of religious undertone to this problem?
>
> A:    No.

(*Id.* at 150).

### b. State Court's Decision

On direct appeal, Majid challenged the propriety of the prosecutor's examination of Franklin III. The Ohio Court of Appeals was agnostic on that question, but concluded that the comments were not prejudicial:

> Appellant next argues that the state engaged in prosecutorial misconduct when the prosecutor questioned Milton Franklin III concerning his Kufi and beard, his father's religious association and the definitions of Islamic terms, including Assalaamu Alaykum, Mujahid and Jihad. "[I]t is improper for the state to rouse the jury to convict merely by exciting their indignation against the defendant, against defense

counsel, or against the crime itself." *State v. Sawyer*, 8th Dist. No. 79197, 2002–Ohio–1095.

> Although we find the prosecutor's line of questioning to be of minimal relevance and straddling the line of impropriety, on this record we cannot find that Milton Franklin III's answers rise to the level of reversible error, as these comments did not deprive appellant of a fair trial.

*Majid*, *supra*, 2012-Ohio-1192, at ¶¶45–46.

The Magistrate Judge found that this decision was not an unreasonable application of the

Supreme Court's prosecutorial-misconduct cases:

> The Eighth District appropriately found that while the prosecutor's questioning of Milton Franklin III was of "minimal relevance and straddling the line of impropriety", it did not rise to the level of egregiousness necessary to deny Petitioner a fair trial. A reviewing court must analyze the alleged misconduct in light of the entire record and the undersigned cannot find the questioning of Mr. Franklin, as to Islamic terms, so outrageous as to pervade the fairness of the entire trial. Mr. Franklin's testimony regarding the tattoos and his acknowledgment that the terms held meaning within his religion are relevant to supporting the credibility of his eyewitness identification. Petitioner's tattoos, as his primary identifier, are relevant regardless of what the tattoos said or stood for, and eliciting testimony regarding the tattoos did not infect the entire trial with unfairness.

(Doc. 22 at 38).

### c. Analysis

As already noted, the test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they were "flagrant." *Al-Din*, *supra*, 631 F. App'x at 334.

On the first prong, not even the Warden contends the questions were proper. (Doc. 8 at 57). The state appellate court, for its part, recognized that the questions elicited only marginally relevant information and were almost out-of-bounds. *Majid*, *supra*, 2012-Ohio-1192, at ¶46. And the trial court sustained defense counsel's objection to the question about the meaning of "Jihad," thereby ruling that at least that question was improper.

21

I therefore conclude that the prosecutor's questions about the meaning of "Mujahid," "Jihad," and "Assalaamu Alaykum" were improper. The closer question is whether the Ohio Court of Appeals's decision that these questions were not flagrantly improper was reasonable.

Under that flagrancy prong, a court considers four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberate or accidentally made; and (4) whether the evidence against the defendant was strong." *Al-Din*, *supra*, 631 F. App'x at 334.

According to the Warden, "[i]t cannot be said that the questions so infected the trial with unfairness so as to make the resulting conviction a denial of due process." (Doc. 8 at 57). To support that conclusion, he argues, somewhat inconsistently with his refusal to defend the questions as proper, that Franklin's answers were relevant because the fact that certain Islamic terms "had meaning for him supported his eyewitness identification of Majid." (Doc. 8 at 57).

If that were true, one might expect to find the prosecutor making an argument along those lines in summation.

But the prosecutor made no such argument. He was apparently content to argue that it was the multiple identifications of Majid – based in part on his unique tattoos, and entirely apart from whatever significance the tattooed terms might have had for Franklin III – that proved his case. (Doc. 8–11 at 62–63; *see also id.* at 29 ("And why did he stand out? There was the manner of the dance in which the group was performing, but there was also the tattoos on the defendant. You also heard that he had multiple tattoos on his chest and his stomach and on his back."))

22

The state appellate court gave no explanation for its conclusion that the prosecutor's questions "did not deprive appellant of a fair trial opinion." *Majid*, 2012-Ohio-1192, at ¶46.

But § 2254(d) requires only that the state court do its homework, not that it also show its work. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). And though neither the Court of Appeals nor the Warden identified a reasonable basis for rejecting Majid's claim, it is nevertheless possible to discern one from the record.

First, as I have already noted, the case against Majid was weighty: five eyewitnesses saw Majid standing outside of Milton's bar and firing a gun into the crowded space. Majid's tattoos provided a unique identifier, bolstering the reliability of those identifications. And there was evidence of Majid's motive to harm or kill Franklin III

Second, it is hard to see how the challenged testimony could have misled the jury.

The danger it posed was, instead, of inflaming the jury's passions against Majid.

There were, for example, the questions about "Assalaamu Alaykum," a phrase that means "Peace be unto you" – and one that Majid notably did not have tattooed on his back. From there, the prosecutor segued into questions about "Mujahid" and "Jihad," questions that were all but certain to elicit – and in fact elicited – a response about a holy war or struggle.

Of great concern, the prosecutor seemed to harken back to the question about Jihad in summation, when he asked the jury to conceive of Majid as an "Islamic warrior." (Doc. 8–11 at 66).

Yet the trial judge promptly, and properly, sustained the defense's objection to that question, thereby alleviating some of the prejudicial effect of Franklin III's answer. *E.g.*, *Young v. Curley*, 2016 WL 3027205, *3 (W.D. Mich.) (recognizing that court's sustaining of objection can cure prejudice).

23

The questions about Franklin III's own faith are less troubling. They introduced evidence that was, even by the prosecutor's estimation, irrelevant. (Doc. 8–9 at 150). But while the evidence was irrelevant, I do not see how it was prejudicial to Majid or linked him to "terrorists." (Doc. 35–3 at 8).

Third, there is no question that the prosecutor's conduct was deliberate: the examination of Franklin III about his faith and his understanding of Islamic terminology took up several pages of the transcript. The prosecutor pursued the issue, moreover, despite a prior objection, during his examination of Whitsett, to a nearly identical question, notwithstanding the trial court's instruction to refrain from that kind of "editorializing" about the basis of a witness's memory.

Fourth, the challenged evidence was not exactly extensive, at least in the context of the trial as a whole. Twenty-one witnesses testified at trial, and the transcript of the proceedings runs to some thirteen-hundred pages. (Doc. 8–3 at 3) (index of trial transcript).

But neither was it isolated. It echoed the prosecutor's questioning of Whitsett, and it presaged his closing argument.

In the end, I am unsure whether, had I been sitting on the panel that heard Majid's direct appeal, I would have voted to reject this claim. But the test is not whether the state court's decision was correct; it is whether the decision was "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted).

The strength of the evidence and the absence of pervasive prejudice are grounds on which a reasonable judge could reject Majid's claim that the prosecutor's misconduct deprived him of a fair trial.

24

**6. Closing Argument**

Majid's final contention is that the prosecutor used his closing argument to inflame the jury's passions against him. In particular, Majid challenges the prosecutor's comments about his "Jihad" and "Mujahid" tattoos.

During his rebuttal argument, the prosecutor asked the jury to consider why Majid had tattooed the word "Jihad" on his back:

> What do you think it takes, from your life experiences, to place this body art on yourself as a person; what statement are you trying to make? Stop and ask yourself that question. Mujahid, a rifle, swords, Jihad. Is that a statement of self expression of don't mess with me. I'm a warrior, I'm dangerous. I'm something that you don't want to mess with. I think the average person would agree with those statements.

(Doc. 8–11 at 58–59).

Despite these comments, in which he linked Majid's dangerousness to his Islamic tattoos, the prosecutor immediately acknowledged that "[t]here is nothing that identifies him before you as some sort of Islamic warrior other than the photos that you've seen in evidence, but they are not offered for that purpose." (*Id.* at 59).

Yet, toward the end of the summation, the prosecutor did something of an about-face by asking the jury to picture Majid as "some sort of Islamic warrior":

> No, let's look at [Majid] because the evidence before you is that he fired those shots into that crowd indiscriminately in the sense that he didn't care who was at or near Milton Franklin, III, he didn't care about the rest of the occupants in the bar, innocent women, it didn't matter to him.
>
> If he's this Islamic warrior, if he's got some sort of honor, he should have called Milton Franklin, III, out and said, business outside.

(*Id.* at 65–66).

25

On direct appeal, the Court of Appeals held that the prosecutor's argument was improper but did not merit a new trial:

> The prosecutor's insinuation that appellant intended his tattoos to express that he was "dangerous" or "something that you don't want to mess with" improperly indicated that appellant was an "Islamic warrior." However, the fact that the prosecutor engaged in some improper argument does not warrant reversal unless the remarks prejudicially affected substantial rights of the accused. *State v. Onunwor*, 8th Dist. No. 93937, 2010–Ohio–5587, ¶ 36. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *Id.*, citing *State v. Lott*, 51 Ohio St. 3d 160, 166, 555 N.E.2d 293 (8th Dist.1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St. 3d 358, 2004–Ohio–6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L.Ed.2d 78 (1982).
>
> Using these standards, we see no basis for reversing appellant's conviction based on the prosecutor's comments. Even though some of the prosecutor's argument may have been improper, such comments did not pervade the entire trial, let alone the closing argument. We are unconvinced that the result of appellant's trial would have been different without the above excerpts of improper commentary by the prosecution. We conclude that the improper statements made by the prosecutor during closing arguments did not substantially prejudice appellant so as to deny him a fair trial.

*Majid*, *supra*, 2012-Ohio-1192, at ¶¶53–55.

Magistrate Judge Knepp concluded that this was a reasonable decision:

> [T]he Petitioner takes issue with the prosecutor's comments during closing arguments that insinuated Petitioner's Islamic tattoos proved he was dangerous, violent, and likened him to a terrorist. (Doc. 19, at 47-50). Upon reviewing the comments made, it certainly appears as if the prosecutor was drawing improper inferences from Petitioner's religion and tattoos; however to find prosecutorial misconduct, the Court does not look to the acts of the prosecutor but rather their effect on the entire trial's fairness. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982); *Lundy v. Campbell*, 888 F.2d 467, 472–73 (6th Cir. 1989). The Court of Appeals concluded that the prosecutor's comments did not rise to the level of reversible error because they did not pervade even the closing argument, let alone the trial as a whole. (Exhibit 1, at 20-21). The Petitioner has not proven that these comments jeopardized the fairness of the judicial process or led the jurors to misconstrue the evidence before them. While the prosecutor's comments were unwarranted, this Court agrees

26

that the comments had neither a "substantial [n]or injurious effect or influence on the jury verdict" such that the outcome would have been different had the prosecutor not made those comments.

(Doc. 22 at 39).

I concur with the Magistrate Judge and the Ohio Court of Appeals that the prosecutor's closing argument was improper.

The prosecutor himself took the position that religious stereotypes had nothing to do with the case against Majid. (Doc. 8–9 at 150; Doc. 8-11 at 59). Yet his argument invited the jury to find that Majid was dangerous, and even guilty, because of the Islamic phrases tattooed on his back. The argument was notably untethered to the issue on which evidence of Majid's tattoos was relevant: the identification, by multiple witnesses, of Majid as the shooter.

Later in his rebuttal argument, the prosecutor continued trying to have it both ways.

He told the jury that, while Majid's tattoos arguably "identifie[d] him . . . as some sort of Islamic warrior," the prosecution itself was not taking such position. (Doc. 8–11 at 59). Only a few moments later, however, the prosecutor asked the jury to consider why, if Majid were "this Islamic warrior" – a position the prosecutor just said had no basis in the evidence – he did not ask Milton Franklin III to step outside, instead of firing a gun into Milton's Lounge. (*Id.* at 66).

This misconduct notwithstanding, the state court's judgment that Majid still enjoyed a fair trial was not objectively unreasonable.

As discussed above, the case against Majid was substantial, and, as with the prosecutor's earlier improprieties, the closing argument did not misrepresent evidence or risk misleading the jury. The closing arguments themselves, moreover, were exceedingly brief in relation to the length of the

27

trial (fewer than forty-five pages for the prosecutor's closing argument, the defense's response, and the prosecutor's rebuttal).

These grounds provide an objectively reasonable, if not entirely convincing, basis for concluding that the prosecutor's misconduct did not violate Majid's right to a fair trial.[4]

\*　　\*　　\*

Majid is not entitled to relief on his prosecutorial-misconduct claim.

Nevertheless, I believe that reasonable judges could disagree whether I correctly resolved this issue, and that Majid's claim deserves encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(2).

I will therefore grant a certificate of appealability on Majid's claim that the prosecutor engaged in misconduct by: 1) questioning Whitsett about the meaning that certain Islamic terms had for him; 2) examining Franklin III about his religion and asking him to define various Islamic terms; and 3) suggesting to the jury during summation that Majid was an "Islamic warrior" whose tattoos were evidence of dangerousness and guilt.

### D. Claim 4: Admission of Prejudicial Evidence

Majid's fourth claim is that the trial court erred by admitting six types of irrelevant and inflammatory evidence:

---

[4] Majid has also alleged the prosecutor committed misconduct by calling him a "coward" and "an embarrassment to the religion he professes to serve." The prosecutor indeed made these comments, though to the court at sentencing, and not to the jury in closing statements. (Doc. 8–11 at 119–20). These were curious remarks for the prosecutor to make, having previously conceded there was no evidence that Majid was an "Islamic warrior" and that the case had nothing to do with religion. But it is apparent that the prosecutor's statement did not influence the trial court's sentencing decision. (*Id.* at 121–25). Accordingly, Majid is not entitled to relief on this claim, either.

- A questionnaire that the prosecutor "snatched" from the defense table and held in his hand while cross-examining Dr. Fulero;

- Milton Franklin III's testimony about the meaning of certain Islamic terms;

- A photo array that the prosecutor showed to Franklin III that he had not seen before;

- A picture of Majid naked from the waist up;

- The absence of evidence that the prosecution sought to produce Marcus Barnes, one of the attempted-murder victims; and

- A reference to Majid's prior trial.[5]

(Doc. 1 at 12–13).

The Magistrate Judge concluded Majid defaulted the bulk of this claim because, in the Ohio Supreme Court, he challenged only the admission of Franklin III's testimony. (Doc. 22 at 20). Magistrate Judge Knepp then determined Majid could not show cause to excuse the default. (*Id.*).

I agree with both rulings.

First, the only improper evidence that Majid challenged in the Ohio Supreme Court was the testimony of Franklin III. (Doc. 8–2 at 224–25).

Second, Majid's claim that appellate counsel was ineffective for not challenging the five other pieces of evidence in the Ohio Supreme Court cannot excuse that default.

For one thing, Majid has not exhausted that appellate-counsel claim in the Ohio courts. *Cf. Edwards v. Carpenter*, 529 U.S. 446 (2000).

---

[5] The State of Ohio had previously tried Majid for these crimes and obtained convictions on the majority of charges. But the Court of Appeals tossed out the convictions after finding "extensive evidence . . . that at least one of the jurors slept through numerous portions of the trial[.]" *State v. Majid*, 182 Ohio App. 3d 730, 731 (2009).

For another, Majid had no constitutional right to counsel in pursuing a discretionary appeal in the state supreme court – and thus no right to the effective assistance of counsel. "[A]ttorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel, including a discretionary appeal." *Tanner v. Jeffreys*, 516 F. Supp. 2d 909, 916 (N.D. Ohio) (Katz, J.).

As for Majid's preserved claim concerning Franklin III's testimony, the state appellate court held that most of that testimony was relevant and properly admitted:

> Appellant argues that the State's questioning of Milton Franklin III regarding the meanings of certain Islamic terms was irrelevant and unduly prejudicial. We disagree. Milton Franklin III testified at trial that he is a Sunni Muslim. Franklin III testified that because of his religious background he recognized the Islamic terms tattooed on appellant's torso when he observed appellant dancing without his shirt and the terms had meaning to him. Appellant further testified that religion had no role in the events of the evening. Franklin III's testimony, as well as other witnesses' testimony regarding appellant's tattoos, was relevant to establish why the witnesses remembered appellant and his distinctive tattoos. As previously discussed, appellant's actions inside the bar, including his behavior on the dance floor and the removal of his shirt to display his tattoos, were the reasons that witnesses took notice of his face and remembered him. This is particularly true of Milton Franklin III, for whom appellant's tattoos had meaning. We cannot say that the trial court abused its discretion in allowing Franklin III's testimony.

*Majid*, *supra*, 2012-Ohio-1192, at ¶59.

I am in complete agreement with the state court's conclusion that Majid's "actions inside the bar, including his behavior on the dance floor and the removal of his shirt to display his tattoos, were the reasons that witnesses took note of his face and remembered him." *Id.*

But I remain unconvinced that Franklin III's familiarity with the terms "Mujahid," "Jihad," and "Assalaamu Alaykum" – the latter of which Majid did not have tattooed on his body –  made

30

his identification of Majid any more credible or reliable. Franklin III never testified to that effect, nor did the prosecutor ask the jury to draw that inference.

Perhaps, as the state appellate court seemed to suggest, the jury could have drawn that inference from Franklin III's testimony on its own. But that elides the question of whether it was proper for the jury to do so. After all, the Court of Appeals acknowledged that the prosecutor's questions about Islam were of "minimal relevance and straddl[ed] the line of impropriety." *Majid*, *supra*, 2012-Ohio-1192, at ¶46.

At bottom, I do not believe the state court acted unreasonably in rejecting this claim, as the admission of the evidence was, for the reasons discussed in connection with Majid's prosecutorial-misconduct claim, unlikely to deprive Majid of a fundamentally fair trial.

### E. Claims 5, 6, 7, 8, and 9: Improper Jury Instructions

Majid's petition raises five jury-instruction claims:

- In his fifth ground for relief, he contends the court's instruction on transferred intent was erroneous and constructively amended the indictment. (Doc. 1 at 16–18).

- Claim six alleges the trial court's use of the phrase "and/or" in the transferred-intent instruction permitted the jury to convict Majid of murder even if the jury did not believe he had an intent to kill. (*Id.* at 17–18).

- Majid's seventh claim alleges that the court issued a causation instruction that "permitt[ed] the defendant to be convicted even if the jury determined that the defendant was innocent[.]" (*Id.* at 20).

- In claim eight, Majid alleges the court instructed the jury that it could convict him of murder or attempted murder even if it determined the shootings were accidental. (*Id.* at 21–22).

- Claim nine alleges the court erred by refusing to tender a lesser-included-offense instruction on involuntary manslaughter and negligent assault. (*Id.* at 24).

31

The Magistrate Judge concluded that claims five and eight were non-cognizable state-law claims. (Doc. 22 at 26–28). He then determined that the Ohio Court of Appeals's decision rejecting claim six was neither contrary to, nor an unreasonable application of, Supreme Court precedent. (*Id.* at 40–41).

As for claim seven, Magistrate Judge Knepp ruled that the state court had rejected it on independent and adequate state-law grounds, thereby working a procedural default. (*Id.* at 21).

Finally, the Magistrate Judge determined claim nine was defaulted because: 1) the state appellate court held Majid waived the claim by failing to request the instructions at trial; and 2) Majid failed to raise the claim in the Ohio Supreme Court.

Majid objects to each of these rulings, but none of the objections has merit.

### 1. Transferred-Intent Instruction

First, Majid's objections (*see* Doc. 35-22 at 7–13) are insufficient to show that the transferred-intent instruction to which he objects in claims five and eight was so "undesirable, erroneous or universally condemned" as to give rise to a cognizable claim. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

As the Court of Appeals explained, the trial court's instructions on transferred intent and causation were accurate statements of Ohio law and appropriate given the nature of the prosecution's evidence:

> In his fifth and thirteenth assignments of error appellant asserts that the trial court erroneously instructed the jury on transferred intent. Appellant claims that the trial court's instruction on transferred intent also constituted a constructive amendment of his indictment. We disagree.

This court has previously rejected the argument that an instruction on transferred intent constitutes a constructive amendment of a defendant's indictment. *State v. Jackson*, 8th Dist. No. 76141, 2000 WL 426556, \*13 (Apr. 20, 2000).

Contrary to appellant's arguments, the transferred intent language used by the trial court is consistent [with] transferred intent instructions we have previously upheld. *Id.*; *see also Whiteside v. Conroy*, 10th Dist. No. 05AP–123, 2005–Ohio–5098, ¶ 5, 55; *State v. Scott*, 7th Dist. No. 02–CA–215, 2004–Ohio–5117, ¶ 21, 28.

The evidence presented at trial established that appellant fired his gun into the bar's picture window with the intent to kill Milton Franklin III but, due to his poor aim, appellant killed Jerome Thomas and wounded Rayshawn Whitsett and Marcus Barnes. The instruction given by the trial court informed the jury that if the defendant intended to kill when he pulled the trigger, it did not matter whether he killed the intended target or an innocent bystander. Based on this evidence, an instruction on transferred intent was supported by the evidence in this case. Accordingly, appellant's fifth and thirteenth assignments of error are without merit and overruled.

In his sixth assignment of error appellant argues that the trial court's instruction on transferred intent allowed the jury to convict him of murder based only on proof that he injured someone rather than caused a death. Appellant seizes solely upon the trial court's instruction regarding transferred intent. Appellant was charged not only with murder but also with two counts of attempted murder of those injured. The trial court provided a single instruction on transferred intent applicable to all counts. The trial court's instruction on transferred intent fit the circumstances of appellant's case. Furthermore, a single challenged jury instruction may not be reviewed piecemeal or in isolation but must be reviewed within the context of the entire charge. *State v. Shopshire*, 8th Dist. No. 85063, 2005–Ohio–3588, ¶ 23, citing *State v. Hardy*, 28 Ohio St. 2d 89, 276 N.E.2d 247 (1971). Appellant's argument completely ignores the court's detailed instructions regarding the murder charge that explicitly required that the jury find that appellant caused the death of Jerome Thomas before he could be convicted of murder.

*Majid*, *supra*, 2012-Ohio-1192, at ¶¶66–71.

In these circumstances, I agree with the Magistrate Judge that claims five and eight are non-cognizable state-law claims that provide no basis for habeas relief.

Second, assuming that Majid's claim respecting the "and/or" language in the transferred-intent instruction raises a cognizable claim, I agree with the Magistrate Judge that § 2254(d) precludes relief.

The transferred-intent instruction stated that:

> If you find that the defendant did have a purpose to cause the death of a particular person, and that the shooting accidentally caused the death and/or injury of another person, then the defendant would be just as guilty as if the gunfire had taken effect upon the person intended.

(Doc. 8–11 at 1903–04).

As Magistrate Judge Knepp recognized, this was a general instruction that stood, not on its own, but applied to both the murder and attempted-murder charges. (Doc. 22 at 41). Its purpose was simply to tell the jury that if Majid intended to kill but, in firing his weapon, struck someone besides the intended victim, Majid had nevertheless committed murder (if the person struck died) or attempted murder (if the victim survived).

Whether considered on its own or in the context of the charge as a whole, the instruction created no likelihood of confusion or unfairness. Because the state court's rejection of the claim was reasonable – indeed, it was entirely correct – Majid is not entitled to habeas relief.

### 2. Causation Instruction

The portions of the record on which Majid relies (*see* Doc. 35–1 at 13–16) do not show he made a contemporaneous objection to the causation instruction. I therefore concur in Magistrate Judge Knepp's conclusion that the state court, in rejecting the claim for want of an objection at trial, denied relief on independent and adequate state-law grounds.

34

### 3. Lesser-Included-Offense Instructions

Finally, there is no merit to Majid's objection that he requested lesser-included-offense instructions on involuntary manslaughter and negligent assault. (Doc. 35–1 at 19–20). To be sure, Majid's trial counsel requested a number of lesser-included instructions, but he did not seek instructions on these two offenses. *Majid*, *supra*, 2012-Ohio-1192, at ¶¶74–88.

Moreover, Majid does not dispute the Magistrate Judge's finding that he failed to raise the lesser-included-offense claim in the Ohio Supreme Court. That provides an independent basis on which to reject the claim. *E.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

### F. Claim 10: Merger of Allied Offenses

In his tenth claim, Majid contends the trial court should have merged his attempted-murder and firearms convictions – and the sentences imposed for those offenses – with his murder conviction and sentence. (Doc. 1 at 25–26).

The Magistrate Judge ruled that the claim was defaulted in light of the Court of Appeals's holding that Majid "failed to object to the court's imposition of multiple sentences and has, therefore, waived all but plain error" review of the claim. *Majid*, *supra*, 2012-Ohio-1192, at ¶90.

Majid's objections address the merits of his merger claim, but do not respond to the threshold procedural-default ruling. (Doc. 35–1 at 25–30.). Because there is no question the state court rejected the merger claim on independent and adequate state-law grounds, I concur in Magistrate Judge Knepp's finding that Majid defaulted this claim.

35

### G. Claim 12: Ineffective Assistance

Finally, Majid alleges that trial counsel was ineffective. (Doc. 1 at 29–30). To support the claim, Majid identifies ten acts or omissions on counsel's part that supposedly fell below an objective standard of reasonableness. (*Id.*).

Magistrate Judge Knepp found that Majid defaulted this claim in part.

He explained that Majid had argued in the Ohio Court of Appeals that counsel was ineffective for only three reasons: 1) he failed to request an accidental-death instruction; 2) he did not object to the prosecutor's inflammatory questions and comments regarding Islam; and 3) he failed to object to the court's responses to certain jury questions. (Doc. 22 at 23). The Magistrate Judge then pointed out that Majid failed to raise the jury-question issue in the Ohio Supreme Court.

The Magistrate Judge therefore found the claim defaulted to the extent it depended on the eight errors or omissions Majid had not fully and fairly presented to the Ohio courts. (*Id.*).

As for the preserved part of the claim, Magistrate Judge Knepp ruled that the Ohio Court of Appeals reasonably rejected Majid's allegations. (*Id.* at 43–45).

### 1. Default

Majid objects to the default ruling, apparently on the ground that his ineffective-assistance claim is sufficiently meritorious that failing to consider it on the merits would be a miscarriage of justice. (Doc. 35–1 at 30; Doc. 35–2 at 1–4).

This misstates the law. Because the Magistrate Judge correctly ruled that Majid defaulted eight bases of his ineffective-assistance claim, I may not review those allegations, however meritorious, unless Majid shows cause and prejudice or establishes actual innocence. Majid has not

36

attempted, however, to make either showing. (*See id.*). Therefore, I reject the bulk of the ineffective-assistance claim on the same default grounds that Magistrate Judge Knepp identified.

## 2. Merits

Majid's first preserved theory of ineffective assistance is that counsel should have requested an "accidental death" instruction.

The Court of Appeals rejected the claim, holding that Majid's argument "confuses the trial court's use of the term 'accidentally' in its transferred intent instruction with the defense of accident" that is available under Ohio law. *Majid, supra*, 2012-Ohio-1192, at ¶99. Because there was "absolutely no evidence that appellant's shooting was the result of an accident instead of an intentional shooting with unintended victims," the state court held that the instruction was unwarranted in Majid's case.

Majid's objection neither acknowledges this holding nor cites any evidence suggesting an accident instruction was warranted. (Doc. 35–3 at 24–27).

Accordingly, in the absence of any basis on which the jury could have found that Majid accidentally fired the gun, there was no reasonable probability that the court, if asked, would have tendered the accident instruction. Likewise, even if the court had given the instruction, there is no probability that the jury would have reached a different result.

Majid's second preserved ineffective-assistance claim is that counsel should have objected to the prosecutor's questions about Islam. But counsel did object:

> We note that appellant's counsel did in fact repeatedly object to the prosecutor's questioning of Milton Franklin III, regarding the meaning of these terms. As addressed in appellant's third and fourth assignments of error, this evidence was relevant to establish why various witnesses remembered appellant from the bar prior to the shooting and no prejudice to appellant resulted.

37

*Majid*, *supra*, 2012-Ohio-1192, at ¶100.

It therefore follows that Majid cannot show that counsel performed deficiently, and I reject the claim on that basis.

## Conclusion

It is, therefore,

ORDERED THAT:

1.    Majid's objections to the R&R (Docs. 35, 35–1, 35–2, 35–3) be, and the same hereby are, overruled;

2.    The R&R (Doc. 22) be, and the same hereby is, adopted as the order of the court;

3.    The petition for a writ of habeas corpus (Doc. 1) be, and the same hereby is, denied; and

4.    A certificate of appealability be, and the same hereby is, granted on Majid's claim that the prosecutor engaged in misconduct by: 1) questioning Whitsett about the meaning that certain Islamic terms had for him; 2) examining Franklin III about his religion and asking him to define various Islamic terms; and 3) suggesting to the jury during summation that Majid was an "Islamic warrior" whose tattoos were evidence of dangerousness and guilt.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

38